BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| *IN RE* Varsity Spirit, LLC Athlete Abuse Litigation, | ) MDL- 1:23-P-9 )  )  ) |

BRIEF IN SUPPORT OF DOE PLAINTIFFS' MOTION
FOR TRANSFER OF ACTION PURSUANT TO 28 U.S.C. § 1407

Plaintiffs respectfully submit this memorandum of law in support of their motion, pursuant to 28 U.S.C. § 1407, to centralize eleven related and overlapping RICO actions filed in seven different districts on behalf of 21 plaintiffs[1] (the "Scheduled Actions"), along with any subsequently filed related actions, before a single judge. Plaintiffs suggest that the United States District Court for the Western District of Tennessee, the Honorable Shery H. Lipman, Chief Judge, would be the most appropriate transferee forum for these coordinated pretrial proceedings. In the alternative, consolidation in the middle district of Florida, Orlando division, the Honorable Carlos Mendoza, would also be appropriate.

BACKGROUND

As set forth in the first filed complaint[2] filed among the Scheduled Actions, *Jane Doe 1, et al v. Varsity Brands, LLC*, C/A No. 6:22-cv-02957-HMH, [ECF 8], (filed Sep. 15, 2022) (hereinafter referred to as "the Lead Varsity Case"), as well as the subsequent actions, Plaintiffs are a group of current or former private cheer athletes. Over the relevant time period, Plaintiffs allege they were subjected to unimaginable and pervasive sexual, physical, and financial abuse all while

---

[1] A full list of the filed cases is included as **Exhibit A**, and shall be referred to herein as "the Scheduled Actions."
[2] Plaintiffs' First Amended Complaint ("the Complaint") added several Plaintiffs to the action but otherwise did not change the overarching allegations against the corporate defendants that have been named in each of the matters subject to Plaintiffs' request for consolidation.

competing for the Varsity network, an interconnected amalgam of clinics, camps, competitions, and affiliated gyms such as Defendant Rockstar.

Plaintiffs in the Lead Varsity Case alleged twelve (12) causes of action: (1) violation of the Protecting Young Victims from Sexual Abuse Act 18 U.S.C. § 2255; (2) Civil Conspiracy in Violation of the RICO Act; (3) Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20; (4) Gross Negligence; (5) Negligent Supervision; (6) *Respondeat Superior*; (7) Assault and Battery; (8) Breach of Contract; (9) Unjust enrichment; (10) Fraud; (11) Negligent Security; and (12) Civil Conspiracy. Cases filed in the subsequent states largely assert the same pattern of behavior against many of the same Defendants. To the extent differences exist, they comprise personal abuse stories of the similarly situated plaintiffs (hereinafter collectively referred to as the Doe Plaintiffs) and the addition of specific Defendant gyms, gym owners, and/or coaches, all of whom, Plaintiffs allege, were certified members within the network created and funded by a consortium of Defendants Bain Capital Private Equity, and Charlesbank, LP, and the Varsity Defendants[3], and overseen by the Varsity Defendants' regulatory bodies, Defendants U.S. All-Star Federation ("USASF") and Defendant USA Federation for Sport Cheering ("USA Cheer")[4].

Plaintiffs' overlapping claims, and in particular Plaintiffs' claims arising pursuant to the laws of the United States, present a compelling case for consolidation in a multidistrict litigation ("MDL"). As an initial matter, these Scheduled Actions assert similar claims that the Defendants conspired with one another to create the appearance of a safe network for minor athletes while simultaneously knowing that the network was rife with opportunities for physical, mental, and

---

[3] As defined in the Complaint, "Varsity Defendants" refers to Defendants Varsity Brands Holding, Co., Varsity Spirit, LLC, and Varsity Brands, Inc.
[4] As used herein, "the Corporate Defendants" refers to the Varsity Defendants, Defendant Bain Capital Private Equity, Defendant Charlesbank, LP, Defendant USASF, and Defendant USA Cheer.

2

emotional abuse. Second, the Scheduled Actions involve overlapping issues for purposes of MDL consideration, including whether plaintiffs' RICO claims, along with other similar claims, should be tried to a jury. Third, transfer will promote the convenience of parties and witnesses. Fourth, transfer will promote the just and efficient conduct of the litigation by avoiding inconsistent pretrial rulings and the burden and expense of needlessly duplicative discovery and pretrial proceedings[5]. Finally, because these cases involve multiple overlapping federal claims and defendants, the need to consolidate proceedings before an MDL court is particularly strong.

Transfer to a single district will allow an orderly, common pretrial process that will streamline discovery, centralize pretrial motions (including dispositive motions), minimize witness inconvenience and overall discovery expense, reduce the opportunities for conflicting rulings, preserve judicial resources, and generally allow all parties to benefit from the efficiencies and economies of scale inherent in an MDL proceeding. Thus, the JPML should grant the Doe Plaintiffs' motion to consolidate these cases in an MDL.

No party will be unfairly prejudiced by the consolidation of these cases for pretrial proceedings and all Plaintiffs currently support consolidation. All of these cases are in their early stages. Preliminary motions have been filed in a number of the cases pending in the District of

---

[5] Plaintiffs note that in the actions pending before the Honorable Carlos Mendoza in the Middle District of Florida, Orlando Division (C/A Nos. 6:22-CV-2146-CEM-LHP; 6:22-cv-2147-CEM-DCI' and 6:22-cv-2149-CEM-DCI), the Corporate Defendants have already consented to consolidation. Moreover, in the matter pending before the District Court in the Western Division of Tennessee, the parties sought a consent briefing schedule, which provided as follows: "The cases, while not identical, contain many overlapping causes of action and present complex claims for relief against multiple defendants, including pursuant to the Racketeer Influenced Corrupt Organizations Act and the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017. At this early stage, the Parties are discussing whether there are possibilities for streamlining and possibly coordinating certain aspects of this complex, multidistrict litigation." (*See Mary Doe on behalf of John Doe 1, et al v. Varsity Spirit, et al*, C.A No. 2:22-cv-02657-JTF-tmp, Special Appearance to Set Briefings Schedule [ECF No. 31] at ¶ 6 (filed Dec. 9, 2022)).

South Carolina, but no discovery has been exchanged in any of the cases, and no scheduling orders entered other than briefing schedules for initial responsive deadlines. Plaintiffs further request that the MDL be assigned to Judge Sheryl Lipman in the Western District of Tennessee. Since 2020, Judge Lipman has presided over several class action cases against the Corporate Defendants related to claims that these Defendants engaged in monopolistic practices in violation of the Sherman Anti-Trust Act and Civil RICO. In addition, Judge Lipman has experience with presiding over an MDL. (*In Re: Family Dollar Stores, Inc. Pest Infestation Litigation*, MDL No. 3032). Accordingly, Judge Lipman is deeply familiar with the Corporate Defendants, as well as certain of the theories underpinning the Scheduled Actions, and has the specific knowledge and experience to ably preside over the proposed MDL.

## STATEMENT OF THE FACTS

### I.     The Parties

Each of the Scheduled Actions contain claims against the Corporate Defendants, and individual Defendant Jeff Webb, the founder and former President of Varsity Spirit, LLC. As set forth in the Scheduled Actions, together these Defendants created, financed, and governed the business of private All-star cheer, and enabled or turned a blind eye to pervasive sexual abuse of participating minors by coaches and adult athletes. At the same time, these Defendants, particularly the Varsity Defendants and Defendants USASF and USA Cheer, used online marketing, advertising, and social media to specifically promote that competitive All-star cheerleading under their system was "safe." As alleged in the Scheduled Actions, these representations were a farce used primarily to extract payments from athletes for membership, apparel, camps, and competitions, leaving problematic coaches in place as long as the coaches continued to generate massive amounts of revenue for the Corporate Defendants.

4

The Scheduled Actions also name gyms, gym owners, and coaches from the gyms (hereinafter referred to as the "Gym Defendants") who do not necessarily overlap. Yet, the common thread among these Gym Defendants is that they were operating within the Corporate Defendants' network, were certified members or working under the jurisdiction of Defendants USASF and USA Cheer, and were lucrative cogs in the revenue factory promulgated by the Varsity Defendants.

## II. The Allegations

Since September, 2022, the Doe Plaintiffs have filed the Scheduled Actions against the Corporate Defendants, Defendant Jeff Webb, and the Gym Defendants alleging a number of federal and state causes of action. Each of the Scheduled Actions contains claims for violation of the Protecting Young Victims from Sexual Abuse Act 18 U.S.C. § 2255 and Civil Conspiracy in Violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962, ("RICO"). As set forth in the Lead Varsity Case, the Doe Plaintiffs are current or former private All-star cheer athletes.

Each of the Scheduled Actions includes allegations that coaches, gym owners, and gyms, such as Defendant Rockstar Cheer, were part of a scheme orchestrated and overseen by the Corporate Defendants and Defendant Jeff Webb to create an unimpeded pipeline of young athletes to perpetuate the Varsity Defendants' monopoly over the cheer industry. This scheme included a plan to anoint and promote specific gyms and coaches placing those members in particular positions of trust with respect to athletes such as the Doe Plaintiffs. Plaintiffs alleged that the Corporate Defendants and Defendant Jeff Webb knew or should have known that these same coaches and gyms were pervasively abusing these athletes.

5

The Scheduled Actions focus on the control the Defendants exercised over the environments, prominent figureheads, and rules that served as the foundations of Plaintiffs' abuse. According to the Scheduled Actions, the Varsity Defendants, under the instruction of Defendant Jeff Webb, overtook the private All-star cheer industry and were thereafter able to dictate its terms, including mandatory monthly and annual fees paid by athletes to gyms and governing bodies, as well as attendance at Varsity network competitions. *Jane Doe 1 v. Varsity, et al*, 6:22-02957-HMH (D.S.C.), Complaint, [ECF. 8]. at ¶ 59 ("Meanwhile, membership in USASF, [the Varsity-founded governing branch] and with a Varsity-affiliated gym mandates competing in a specified number of annual [V]arsity events"). This scheme required continual access to children. *Id.* at ¶¶ 41-78; *see* RCS [ECF 38] at ¶5(f) ("…The system was designed to attract new gym owners, reward existing gym owners, and encourage minor athletes to become coaches and gym owners themselves one day in an effort to continue generating billions of dollars of revenue for the corporate Defendants. At the same time… Defendants also publicly represented, and represented through online, social media, and other digital and print campaigns that USASF was the standard of care in cheer safety, and that a primary role of USASF was to protect minor athletes from sexual exploitation and abuse"); *see* Complaint at ¶ 123 ("In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age athletes, and the coaches and gyms used the Varsity Defendants' reputation in order to bolster their own reputation with [ ] athletes").

The Scheduled Actions allege "it was contrary to the Varsity Defendants' business model to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue." *Id.* at ¶ 125. As set forth in the Scheduled Actions, "when allegations

about a specific coach, or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not 'credible' based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct against minors." *Id.* at ¶ 126. The manner in which Defendant USASF handled reports against Christopher Hinton (*See Jane Doe 1, et al v. Varsity Spirit, et al*, 6:22-cv-02957-HMH, RICO Case Statement [ECF No. 38] at ¶ 5(b)(15))*,* and Taji Davis and Brandon Hale (*See generally, John Doe 1 v. Varsity Spirit, et al*, C/A No. 1:22-cv-02139, [ECF No. 1] Northern District of Ohio), are specific examples of this deflection and delay.

As set forth in the Scheduled Actions, Defendant USASF was the brainchild of the Varsity Defendants and Defendant Webb, created in response to an effort by the National All-Star Cheerleading Coaches Congress (NACCC) to centralize and formalize rules, processes, and procedures, which would have been applicable to the Varsity Defendants and their affiliates, and which would potentially compromise the Varsity Defendants' grip on the industry. *See* Rockstar Complaint, at ¶¶ 51-52 ("Within a week [of the NACCC founding] Defendant Webb, through Defendant Varsity, founded Defendant USASF, and mandated that All-star athletes purchase a USASF membership as a requirement to competing at Varsity-sponsored events"); *see also* "Varsity-Backed Cheer Governing Body Faces Debt & Obligations," Daniel Libit, Sportico, (Jan. 23, 2023), available at: [Varsity-Backed USA Cheer Downplays Ties to Company and USASF – Sportico.com](), recounting a conversation between Jeff Webb and Les Stella, a former International All-star Federation Executive Director, Webb was quoted as saying Varsity Spirit created USASF

not because "we wanted some governing body to f-ing tell us what to do. It was our strategy to take over all-star cheerleading, and it f-ing worked too")[6].

After creating USASF, the Varsity Defendants thereafter created coach and gym certification, which was touted as an additional layer of athlete protection that warranted specific gyms, coaches, and vendors had been duly vetted and deemed safe by Varsity-syndicate USASF. *Rockstar Complaint* at ¶ 53; *see* RCS ¶ 6(b) ("In the interim, Defendant USASF and USA Cheer support[ed] the idea of credentialing coaches and gyms. Defendants suggest that this certification is tantamount to a seal of safety, and that coach and gym credentials are primary examples of why participation in Varsity events is superior to participation in other events"). The Varsity Defendants also expanded their control by hosting coaching conferences, purchasing gyms, offering gym owners cash incentives for participating in the Varsity network, and even adopting marketing and event tactics targeted at impressionable young athletes. *See* Rockstar Complaint at ¶¶ 71-74; *see* RCS at ¶ 2(b). In its recently filed motion to dismiss the South Carolina cases, Defendant USASF relies upon its Code of Conduct and Compliance, which purports to apply to individual athletes, as well as coaches, gyms, owners, and vendors who wish to compete within the Varsity network. (*See Jane Doe 1, et al*, 6:22-cv-02957-HMH, [ECF No. 126-2], Glossary, p. 13 of 62). In addition, from these documents, it appears that the jurisdiction of Defendant USASF (and, also the Varsity Defendants), includes all "travel, lodging, practice, competition[s], exhibitions and/or any All Star related activity or Event[.]" (*Id.*)

In sum the Scheduled Actions allege: "the Varsity Defendants, through USASF and USA Cheer, have created an elaborate illusion of a safe system [ ] to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young

---

[6] Through a spokesperson, Defendant Webb indicated he has no specific recollection of this quote.

8

vulnerable members were at risk and that [Defendants] were doing nothing about removing the criminal coaches and gym owners known to be creating that risk." *Rockstar Complaint* at ¶ 182.

In the Scheduled Actions, the Doe Plaintiffs' allegations include extensive and specific examples of Defendants' misconduct, and the inner dynamics of the relationships between the Varsity Defendants and their co-conspirators including the remaining Corporate Defendants. Each individual Plaintiff set forth a painful recitation of the abuses and injuries they suffered all while continuing to fund Defendants' Enterprise. (*E.g.* Rockstar Complaint at ¶ 108: "…[T]he Varsity Defendants reaped massive financial benefits associated with a growing network of families who came into Varsity affiliated gyms, and who believed the Varsity Defendants' representations that they were providing a safe and protective environment for families").

## ARGUMENT

I. **Transfer and Pretrial Coordination of These Related Actions Will Promote the Goals of 28 U.S.C. § 1407.**

Under 28 U.S.C. § 1407, transfer and coordination of related cases is appropriate where: (i) "civil actions involving one or more common questions of fact are pending in different districts"; (ii) transfer and coordination "will promote the just and efficient conduct of such actions"; and (iii) transfer and coordination will serve "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). The Scheduled Actions easily satisfy these statutory criteria.

A. **The Actions Involve Common Factual Issues**.

Pursuant to 28 U.S.C. § 1407(a), "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." With respect to transfers involving a respectively limited number of actions, the Joint Panel on Multi-District Litigation ("JPML") has held that:

9

> [T]o demonstrate that the just and efficient conduct of the litigation would be promoted by transfer where only a minimal number of actions are involved, the moving party *bears a strong burden to show that the common questions of fact are so complex and the accompanying discovery so time-consuming* as to overcome the inconvenience to the party whose action is being transferred and its witnesses.

*In re Royal Am. Indus., Inc. Securities Litigation*, 407 F. Supp. 242, 243 (J.P.M.L 1976) (emphasis added). Thus, "[i]f only one question of fact is common to two or three cases pending in different districts there probably will be no order for transfer, since it is doubtful the transfer would enhance the convenience of parties and witnesses or promote judicial efficiency." *In re Scotch Whiskey*, 299 F. Supp. 543, 544 (J.P.M.L 1969). Consolidation may be appropriate, however, even over a small number of cases, where those cases present sufficiently complex questions of fact. *Id.*; *see also In re Clark Oil & Refining Corp. Antitrust Litigation*, 364 F. Supp. 458, 459 (J.P.M.L 1973) ("We believe that the greater complexity of factual issues presented here and the presence of competing requests for class designation distinguish this litigation from the *Scotch Whiskey* cases and make transfer necessary in order to avoid duplication of discovery and eliminate the possibility of conflicting pretrial rulings.").

The existence of a common scheme in the Scheduled Actions makes transfer pursuant to Section 1407 particularly appropriate here. *See In re U.S. Foodservice, Inc. Pricing Litig.*, 528 F. Supp. 2d 1370, 1371 (J.P.M.L. 2007) (putative class actions challenging "scheme [by defendant] to overcharge its customers by manipulating" costs under certain contracts). Much like in *In re U.S. Foodservice, Inc. Pricing Litig.*, another RICO case, the Scheduled Actions raise common factual questions regarding the propriety of the Collective Defendants' representations to and conduct with Plaintiffs. "Transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program that: (1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common

10

issues, *In re Smith Patent Litigation,* 407 F.Supp. 1403, 1404 (J.P.M.L.1976); and (2) ensures that pretrial proceedings will be conducted in a streamlined manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties and the judiciary." *Id.*

While the Scheduled Actions contain specific allegations as to the Doe Plaintiffs, the Scheduled Actions also contain the same overarching facts pertaining to the Collective Defendants. For instance, the Scheduled Actions present the following common questions:

1. Whether the misrepresentations of the Defendants on the Varsity, USASF, and USA Cheer websites regarding certification and safety of gyms and coaches in their All-star cheer network constituted wire fraud under the civil RICO statute.

2. How and to what extent Defendant Jeff Webb individually made decisions on behalf of and exerted control over the Varsity Defendants, USASF or USA Cheer with respect to their actions or inactions on reports of sex abuse against minors within their All-star cheer network.

3. How and to what extent Defendant Bain and/or Defendant Charlesbank participated in and/or directly controlled decision making with respect to representations of safety within the All-star cheer network.

4. Whether Defendant USASF and/or Defendant USA Cheer failed to investigate and/or suspend certain coaches against whom reports of sex abuse had been made.

5. Whether the Varsity Defendants, Defendant Jeff Webb, Defendant USASF, and/or Defendant USA Cheer prohibited or restricted minors who had reported instances of abuse from leaving their current gyms to get away from their abusers.

6. Whether the policy precluding athletes from transferring between gyms in the Varsity network had a chilling effect on reports of abuse and misconduct.

7. Whether the Varsity Defendants, Defendant Jeff Webb, Defendant USASF, and/or Defendant USA Cheer participated in any means of threatening or intimidating any child, or their family, for reporting sex abuse against certain coaches and gym owners in the All-star cheer network or discussing such allegations.

8. Whether the Collective Defendants promoted certain lucrative gyms, coaches, vendors, and/or gym owners despite knowledge or with reckless disregard for whether those gyms and owners presented specific threats to athlete safety (e.g. Jerry Harris, Scott Foster, Kenny Feeley, Brandon Hale).

9. Whether Defendant Varsity, Defendant Jeff Webb, Defendant USASF, and/or Defendant USA Cheer actively participated in making decisions regarding coach and/or gym owner investigations, suspensions, or bans after reports of sex abuse against minors.

10. Whether the Varsity Defendants used Defendant USASF to further isolate athletes by implementing certain rules, regulations, and codes of conduct and compliance.

11. Whether the Varsity Defendants represented to families that Defendant USASF was a means by which athletes could safely participate in cheer, all while the Collective Defendants knew or should have known that Defendant USASF was not in fact operating as publicly represented;

12. Whether Defendants' representations were tantamount to a standard of care binding Defendants to adhere to a certain course of conduct;

13. Whether and to what extent Defendant USASF was understaffed for its regulatory and governing function;

14. Whether and to what extent "certification" was simply another means by which the Collective Defendants could collect further fees and ensure continuous control over the private cheer industry;

15. Whether and to what extent the Collective Defendants promoted "credentialing" as an additional layer of safety offered at USASF sanctioned events;

16. Whether "USASF sanctioned" events were all Varsity events;

17. What role the Collective Defendants played in underfunding and/or understaffing those entities and/or units which were charged with providing athlete safety oversight and processing abuse reports.

18. Whether Defendant Varsity, Defendant Jeff Webb, Defendant USASF, Defendant USA Cheer, Defendant Bain, and/or Defendant Charlesbank exerted any authority, control, or decision making over the continued employment or affiliation of any known sex offender within the All-star cheer network.

When common questions such as those set forth above predominate, the JPML has consistently consolidated complex multistate actions. *See In re Santa Fe Natural Tobacco Co. Mktg. and Sales Practices Litigation*, 178 F. Supp. 3d 1377, 1378 (J.P.M.L 2016) (finding centralization would serve the convenience of the parties and promote a just and efficient outcome). In *In re: LivingSocial Mktng. And Sales Practices Litigation*, the JPML found that consolidating and transferring five actions in five districts would serve the convenience of the parties and witnesses and promote the just and efficient conduct of litigation. 807 F. Supp. 2d 1379, 1379–80 (J.P.M.L 2011). The JPML noted that all of the actions involved common factual questions regarding "LivingSocial's sale of gift certificates/vouchers with allegedly improper expiration dates and other objectionable provisions (e.g., requirements that gift certificates be used

in a single transaction, that cash refunds will not be made for unused portions, and not more than one gift certificate can be redeemed at one time)." *Id.* at 1380. As such, the JPML determined that centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary. *Id.*

In *In re: Marine Hose Antitrust Litigation (No. II),* the JPML consolidated five actions that alleged "the defendant business entities and their executives engaged in a global conspiracy to fix prices, rig bids, and allocate markets for marine hoses and related products." 531 F. Supp. 2d 1381, 1381–82 (J.P.M.L 2008). Accordingly, the JPML concluded that centralization would eliminate duplicative discovery, avoid inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary. *Id.*

Similarly, In *In re: Kaba Simplex Locks Mktg. and Sales Practices Litigation*, the JPML centralized eight actions pending in four districts where the JPML found centralization would eliminate duplicative discovery, avoid inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary. 764 F. Supp. 2d 1339, 1340 (J.P.M.L 2011). In particular, the JPML noted in *Kaba* that a transfer under Section 1407 included the benefit of "placing all actions in this docket before a single transferee judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions." *Id.* The JPML noted that a transfer would not put any additional burden on the parties or witnesses as "Section 1407 transfer is for pretrial proceedings only [and] there is usually no need for the parties and witnesses to travel to the transferee district for depositions or otherwise." *Id.*

14

Here, common questions of fact as to the Collective Defendants will lead to resolution of common questions of law (i.e. whether these corporate practices violated civil RICO, including violations of 18 U.S.C. § 1962(c)). Additionally, each of the Scheduled Actions will require vast corporate discovery, all of which will be essentially co-extensive across the actions. Thus, the common factual issues, common discovery needs, and need to avoid inconsistent adjudications on these issues support transfer under section 1407.

### B. Centralization Will Promote the Just and Efficient Management of Pretrial Proceedings in the Actions.

As explained above, many of the central factual issues in the Scheduled Actions overlap leading to common legal questions arising under federal law. The desire to avoid inconsistent rulings on substantive issues is an important factor in centralizing matters in a single forum. *See In re Charlotte Russe, Inc. Fair & Accurate Credit Transactions Act Litig.,* 505 F. Supp. 2d 1377, 1378 (J.P.M.L. 2007) ("Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings"); *In re CertainTeed Corp. Roofing Shingle Prods. Liabl. Litig.*, 474 F. Supp. 2d 1357, 1358 (J.P.M.L. 2007) (same). If the Scheduled Actions are transferred into an MDL, the MDL court can efficiently resolve overlapping issues in a single proceeding. The alternative would lead to a multitude of potentially contradictory rulings across different jurisdictions. *See In re WellPoint, Inc., Out-of-Network UCR Rates Litig.*, 652 F. Supp. 2d at 1378 (observing that transfer was necessary to "prevent inconsistent pretrial rulings"); *In re Aetna, Inc., Out-Of-Network UCR Rates Litig.,* 609 F. Supp. 2d at 1371 (same).

Moreover, "[i]n addition to balancing complexity and commonality against the convenience of parties and witnesses, the determination of whether transfer of a minimal number of actions would promote the just and efficient conduct of the litigation requires consideration of the relative effect on judicial effort." *Royal Am. Indus., Inc. Securities Litigation*, 407 F. Supp.

15

242, 243 (J.P.M.L 1976). Thus, in deciding whether transfer and consolidation would reduce the expenditure of judicial resources, "the possibility of cooperation among the judges to whom the constituent actions are assigned must be evaluated as an alternative." *Id.*

Based upon the risks of inconsistent pre-trial rulings, both on substantive questions, as well as procedural issues that might impact substantive concerns (e.g. discovery disputes), consolidated pretrial proceedings will promote the just and efficient management of the proceedings in the scheduled actions.

### C. Centralization Will Serve the Convenience of Witnesses and Parties.

Transfer of the Scheduled Actions for coordinated or consolidated pretrial proceedings will also serve "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). There can be no question that formation of an MDL for the Scheduled Actions will eliminate duplicative discovery. *See In re Starmed Health Pers. Fair Labor Standards Act Litig.*, 317 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (consolidating two actions because, inter alia, transfer was necessary to "eliminate duplicative discovery" and "conserve the resources of the parties"). Given the substantially similar nature of the allegations in each of these cases, the Doe Plaintiffs will likely request production of the same information from the Collective Defendants, all of which will be stored in the same manner and may be produced in the same manner.

In addition, all of the Doe Plaintiffs can be expected to seek depositions of many of the same employees and officers. Absent transfer, the parties and the individual courts would be subjected to the inefficiency of duplicative discovery demands and disputes, as well as multiple depositions of the same witnesses. The parties would also incur unnecessary expenses and fees associated with submitting multiple expert reports, redundant expert depositions, and multiple *Daubert* motions, which could also result in inconsistent rulings. Centralization would avoid these

problems by allowing a single judge to formulate a streamlined pretrial proceeding that would minimize witness inconvenience and overall expense. *See In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) ("[Plaintiffs] will have to depose many of the same witnesses, examine many of the same documents, and make many similar pretrial motions in order to prove their . . . allegations. The benefits of having a single judge supervise this pretrial activity are obvious."). In sum, transferring these actions to a single MDL court is necessary to "eliminate duplicative discovery, prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994).

## II. The Western District of Tennessee Is the Most Suitable Forum for Centralized Proceedings.

In determining whether a specific forum is an appropriate transferee district for pretrial proceedings, the JPML may consider a number of factors, including whether the forum is an accessible location for the parties, and the proximity of the forum to Defendants' home offices, discovery, and witnesses. *In re Stryker Orthopaedics LFIT V40 Femoral Head Products Liability Litigation*, 249 F.Supp.3d 1353, 1356 (J.P.M.L. 2017) (finding the District of Massachusetts was an appropriate transferee to centralize six actions and twenty-seven tagalong actions based in part upon the Court's familiarity with certain of the already-filed actions, but also because the location was accessible, and proximate to one of the defendant's headquarters where relevant documents and witnesses may be found); *see In re Dealer Management Systems Antitrust Litigation*, 291 F.Supp.3d 1367, 1369 (J.P.M.L. 2018) (Transferring the cases to the Northern District of Illinois, the JPML found "[t]he district is a central, readily accessible venue for all parties. [Defendant] is headquartered in the district, and relevant documents and witnesses thus will be found there. Further, centralization in the Norther District of Illinois enables us to assign the litigation to Judge

17

Amy J. St Eve, an able and experienced jurist who has skillfully handled a number of other MDLs").

Each of the Scheduled Actions names the Varsity Defendants, all entities organized, existing and headquartered in the Western District of Tennessee. As such many of the documents, witnesses, and other discoverable information in this litigation are likely located in the Western District of Tennessee. In addition, Tennessee serves as a central location for this litigation, which, although spanning the country, predominantly involves the eastern seaboard of the United States. Finally, Judge Sheryl Lipman is the Chief Judge in the Middle District, and currently before her are three class actions against the very same Corporate Defendants involved in the instant dispute, and dealing with allegations that these Corporate Defendants engaged in conduct in violation of the Sherman Anti-trust Act and civil RICO. Judge Lipman is also the presiding judge over a current MDL in the district. Accordingly, Judge Lipman's skill as a jurist, her familiarity with the parties at issue in this matter, and her familiarity with the MDL process provide assurance that she will deftly handle the Scheduled Actions.

As an alternative, Plaintiffs propose the Middle District of Florida, the Orlando Division, before the Honorable Carlos E. Mendoza. Three of the Scheduled Actions are currently pending before Judge Mendoza, who has already seen fit to consolidate these Actions for pre-trial and other purposes given the similarity of the allegations. In addition, Orlando, Florida is a readily accessible forum, and many of the Varsity Defendants' most important competitions take place in Orlando – thus it is an appropriate forum for consolidation of the Scheduled Actions.

## CONCLUSION

For the reasons set forth herein, consolidation of the Scheduled Actions will preserve valuable resources, resolve substantial legal and factual questions without the risk of contradictory

rulings, eliminate duplicative discovery, and otherwise aid in the expedient resolution of this litigation. As further provided herein, the Western District of Tennessee is an appropriate transferee forum, as is the Central District of Florida, Orlando Division. Accordingly, Plaintiffs now ask the JPML to consolidate these actions for pre-trial purposes.

        **STROM LAW FIRM, LLC**

        *s/ Bakari T. Sellers*
        Bakari T. Sellers (SC Fed. ID No. 11099)
        Mario A. Pacella (SC Fed. ID No. 7538)
        Amy E. Willbanks (SC Fed. ID No. 13537)
        Jessica L. Fickling (SC Fed. ID No. 11403)
        Alexandra Benevento (SC Fed. ID No. 10734)
        6923 N. Trenholm Road, Suite 200
        Columbia, South Carolina 29206
        Phone: (803) 252-4800
        Facsimile: (803) 252-4801
        Email: bsellers@stromlaw.com
               mpacella@stromlaw.com
               awillbanks@stromlaw.com
               jfickling@stromlaw.com
               abenevento@stromlaw.com

        *Attorneys for Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, John Doe 1, John Doe 2, and John and Jane Does 1-100*
        *D. South Carolina; 6:22-02957*

March 1, 2023